# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Dwile K. II,                                    Case No. 20-cv-2321 (ECT/ECW)

      Plaintiff,

v.                                              **REPORT AND RECOMMENDATION**

Kilolo Kijakazi, Acting Commissioner of
Social Security,

      Defendant.

This matter is before the Court on Plaintiff Dwile K. II's ("Plaintiff") Motion for Summary Judgment (Dkt. 20) and Defendant Acting Commissioner of Social Security Kilolo Kijakazi's ("Defendant") Motion for Summary Judgment (Dkt. 25). Plaintiff is seeking judicial review of a final determination by the Social Security Administration denying his application for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act, 42 U.S.C. § 401 et *seq*. This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons stated below, the Court recommends that Plaintiff's Motion be granted in part, Defendant's Motion be denied, and that this case be remanded to the Commissioner consistent with this Report and Recommendation.

## I.    PROCEDURAL BACKGROUND

On March 29, 2018, Plaintiff filed an application seeking DIB benefits alleging that he became disabled on November 3, 2017, due to hearing loss, right shoulder

surgery, and a glass eye.  (R. 61, 70, 163-66).[1]  Plaintiff's application for disability

insurance benefits was originally denied and then denied upon reconsideration, and

Plaintiff requested a hearing before an administrative law judge.  (R. 86-92, 94-98.)

Administrative Law Judge Pearline Hardy ("ALJ") held a hearing with Plaintiff,

who was represented at the hearing by counsel, on October 16, 2019.  (R. 27-59.)  On

October 30, 2019, the ALJ issued an unfavorable decision.  (R. 22.)

In making this determination, the ALJ followed the five-step sequential evaluation

process pursuant to 20 C.F.R. § 404.1520.  At the first step, the ALJ found that Plaintiff

did not engage in substantial gainful activity during the period from the alleged onset

date.  (R. 15.)  At step two, the ALJ found that Plaintiff suffered from the following

severe impairments: "severe impairments: right shoulder degenerative joint

disease status-post bicep tendinosis repair, debridement, arthroscopy with subacromial

decompression, bursectomy, and excision; obesity; gout; bilateral hearing loss; and

history of left prosthetic eye."  (R. 15.)

At step three, the ALJ found that Plaintiff did not have an impairment or

combination of impairments that met or medically equaled the severity of one of the

listed impairments in 20 CPR Part 404, Subpart P, Appendix 1.  (R. 16.)

The ALJ then assessed Plaintiff with the following residual functional capacity

("RFC"):

> After careful consideration of the entire record, the undersigned finds that
> the claimant has the residual functional capacity to perform medium work as
> defined in 20 CFR 404.1567(c) except with no overhead reaching or lifting
> with the dominant right upper extremity; however, the claimant could

---

[1]    The Social Security Administrative Record ("R.") is available at Dkt. 19.

frequently reach and lift in all other directions with the right upper extremity and occasionally push/pull with the right upper extremity up to 10 pounds. The claimant should not climb ladders, ropes, or scaffolds nor crawl. The claimant could occasionally operate foot controls, but should not work at unprotected heights, operate dangerous machinery, use peripheral vision on the left side, or be required to have fine hearing capability. The working environment should have quiet noise with occasional interaction with the public and in-person job task training.

(R. 17.)

The ALJ concluded, based on the above RFC and the testimony of the vocational expert ("VE"), that Plaintiff could not perform his past relevant work. (R. 20.) The ALJ also determined after consulting the VE at the hearing that given Plaintiff's age, education, work experience, and RFC, there were other jobs that exist in significant numbers in the national economy that he could perform the requirements of, including representative unskilled (SVP 2) medium occupations such as a linen room attendant (DOT# 222.387-030) 230,000 jobs nationally; and furniture assembly (DOT# 754.685-014) 50,000 jobs out of 241,000 jobs nationally (reduced for quiet noise level). (R. 21.)

Accordingly, the ALJ deemed Plaintiff not disabled. (R. 21.) Plaintiff requested review of the decision and the Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner. (R. 1-6.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.    RELEVANT RECORD

On June 16, 2017, Plaintiff underwent a right shoulder arthroscopy with subacromial decompression, bursectomy, and excision of the distal clavicle. (R. 464.) Plaintiff's preoperative diagnosis included acromioclavicular joint arthritis and a possible small anterior labral tear. (R. 464.) October 27, 2017, Plaintiff was diagnosed with severe bicipital tendonitis. (R. 322.)

On November 7, 2017, Plaintiff saw Ryan Foley, M.D., for a follow-up related to his right shoulder pain. (*Id.*) It was noted that Plaintiff had been struggling with right shoulder pain and that while he recently had 100% relief of his pain with a cortisone injection into the bicipital groove, his pain had returned. (*Id.*) While Plaintiff had attempted conservative pain management, he wanted to proceed with surgical intervention, due to ongoing pain, involving a shoulder diagnostic arthroscopy and mini open subpectoral biceps tenodesis. (*Id.*)

On November 13, 2017, Plaintiff was seen by a nurse practitioner for a pre-operative appointment for arthroscopic surgery on his right shoulder and mini open subpectoral biceps tenodensis related to severe bicipital tendonitis. (R. 314.) Plaintiff represented that "[s]ince August 2016 [he] has worked at an underground utilities company, he is currently laid off for the season through the winter." (*Id.*) It was noted that Plaintiff was not in any acute distress. (R. 318.)

On November 16, 2017, Plaintiff underwent a shoulder arthroscopy, open tenodesis repair (right) and debridement arthroscopy labrum shoulder (right). (R. 324-25.)

On November 22, 2017, Plaintiff was seen by a physical therapist for intake related to pain in his right shoulder.  (R. 330.)  Plaintiff rated his pain at 6-10/10, which was aggravated by all activities.  (R. 331.)  Plaintiff was taking narcotic pain relief at night and nothing during the day.  (*Id.*)

Plaintiff was referred to physical therapy, but it was noted that he would be missing some of his appointments because he was going on vacation.  (R. 333.)  It was also noted that Plaintiff was not working because he had been laid off for the season.  (R. 331.)

December 1, 2017, Plaintiff was seen for a post-operative follow-up.  (R. 344.)  It was noted that "Patient currently rates pain as Minimal, currently rated at 2.  They are not currently experiencing numbness, tingling, weakness to the effected limb."  (*Id.*)  In addition, Plaintiff demonstrated "unaffected ability to perform active shoulder abduction, elbow flexion/extension, wrist flexion/extension, finger abduction/adduction, finger flexion/extension at MCP joints, and thumb opposition/flexion/extension on the right upper extremity."  (R. 346.)

On December 11, 2017, Plaintiff participated in physical therapy.  (R. 349.)  Plaintiff denied pain and his range of motion was improved.  (*Id.*)  During his December 18, 2017 physical therapy session, Plaintiff denied pain and was anxious to start more active movement.  (R. 352.)  During a December 27, 2017 physical therapy session, Plaintiff reported "using arm actively including biceps flexion."  (R. 356.)  At his January 3, 2018 physical therapy session, Plaintiff demonstrated "his range of motion actively, mostly pain free, but occasional pain with certain quick movements.  He reports noting

just a little pinching in the armpit area and front of shoulder. Overall reports he is doing well. Doing a little light lifting at home." (R. 358.)

On January 3, 2018, Plaintiff reported to Dr. Foley that his pain was minimal, he was not experiencing numbness, tingling, weakness to the affected limb, and that he was feeling much better than he did after the first surgery. (R. 361.) Plaintiff did not appear in any acute distress. (R. 363.) In addition, Plaintiff demonstrated an unaffected ability to perform active shoulder abduction, elbow flexion/extension, wrist flexion/extension, finger abduction/adduction, finger flexion/extension at MCP joints, and thumb opposition/flexion/extension on the right upper extremity. (R. 364.) Plaintiff had full active range of motion. (*Id.*)

During his January 8, 2018 physical therapy session, Plaintiff's range of motion was mostly pain free and he claimed he was mostly doing well. (R. 366.) He also reported that he had been moving between homes and was lifting light boxes, as well as sorting and tossing items. (*Id.*) On January 18, 2018, Plaintiff reported soreness in his shoulder and arm from moving the previous two days, including lifting items weighing 40-50 pounds. (R. 372.) On January 22. 2018, Plaintiff reported less soreness, and that he had moved a couch. (R. 375.)

On April 14, 2018, Plaintiff saw Dr. Foley related to his slipping and falling on ice on April 5, resulting in severe pain in his shoulder and weakness in his arm since that time with no improvement. (R. 383.) Plaintiff's range of motion in his shoulder was reduced, but the strength in his shoulder was as at full strength except for a rating of 4 out of 5 with respect to the supraspinatus. (*Id.*) The radiographical images of Plaintiff's

shoulder showed no abnormalities. (R. 384.) Dr. Foley noted that Plaintiff's exam was concerning for possible rotator cuff tear, but found that he could return to work as long as he did not use his right upper extremity. (*Id.*)

During an April 20, 2018 exam, it was noted that Plaintiff demonstrated a normal range of motion, but exhibited tenderness in his right shoulder. (R. 389.)

On April 25, 2018, Plaintiff underwent an MRI of his right shoulder that showed postsurgical changes consistent with biceps tenodesis in the subpectoral area, a mild supraspinatus tendinosis without discrete tendon tear, and an interval mild widening of the acromioclavicular interval with suspicion of low-grade acromioclavicular ligamentous injury. (R. 395, 407.)

On May 1, 2018, Dr. Foley filled out a Social Security Physical Medical Source Statement for Plaintiff for the period of November 2017 through the present pertaining to his right shoulder. (R. 667.) Plaintiff had been last seen by Dr. Foley on April 13, 2018. (*Id.*) The prognosis for Plaintiff was good. (*Id.*) The treatment for Plaintiff involved physical therapy. (*Id.*) Plaintiff's symptoms included pain, decreased range of motion, and weakness. (*Id.*) Dr. Foley's findings for Plaintiff were based on Plaintiff's pain. (*Id.*) In addition, Dr. Foley opined that Plaintiff's impairments lasted or could be expected to last at least twelve months. (*Id.*) According to Dr. Foley, Plaintiff's pain, other symptoms, or medication side effects, were severe enough to interfere with his attention and concentration between 50-75% of the day. (R. 668.) Dr. Foley checked both the "incapable of even low stress jobs" and "capable of low stress jobs" entries when asked to rate the Plaintiff's ability to tolerate work stress. (*Id.*) Dr. Foley also

opined that Plaintiff could adequately ambulate. (*Id.*) Moreover, when asked to best describe Plaintiff's capacity to work 8 hours per day, 5 days per week, Dr. Foley checked the "symptoms will interfere to the extent that the patient is unable to maintain persistence and pace to engage in competitive employment" and "Sedentary work, lifting up to 10 lbs. occasionally, lifting and carrying small items, standing/walking no more than two hours in eight-hour day" categories. (*Id.*) Dr. Foley believed that Plaintiff could work on a part-time basis 3-4 hours a day, 2 to 3 days per week. (R. 669.) Physical activity and movement could exacerbate Plaintiff's symptoms. (*Id.*) Further, Dr. Foley opined that Plaintiff would need to miss work four or more times per month due to his symptoms. (*Id.*) Dr. Foley also claimed Plaintiff would experience fatigue related to his condition, and that such fatigue would impair Plaintiff's ability to work from a moderate to severe degree. (R. 670.) The restriction for Plaintiff was to restrain from using his right arm for work. (*Id.*) According to Dr. Foley, Plaintiff could occasionally lift less than 10 pounds, could occasionally to never lift 10 pounds, and could never lift 20-50 pounds. (*Id.*) Dr. Foley opined that Plaintiff could frequently bend, twist, stoop, kneel, crouch, and crawl; engage in firm and fine grasping, static neck flexion, and frequent neck rotation; and was able to walk up an incline. (R. 671.) Dr. Foley further opined that Plaintiff could occasionally climb, engage in fine grasping with his right hand, and engage in firm grasping with his right hand. (*Id.*) In addition, Dr. Foley determined that Plaintiff could never reach, pull, or push with his right arm; and could never do overhead work. (*Id.*) Plaintiff could not perform repetitive activities with his upper extremities and did not have good use of both hands and fingers as needed for

bilateral manual dexterity. (*Id.*) However, Dr. Foley found that Plaintiff had good use of his hands and fingers for repetitive hand-finger actions and could manipulate, handle, and work with small objects with both hands. (R. 672.) Moreover, Dr. Foley opined that Plaintiff could sit and stand about 6 hours out of an 8-hour workday. (*Id.*) Dr. Foley also opined that Plaintiff's capacity for performing work activities was affected by the fact that "arm movements are limited. Due to pain and decreased range of motion." (*Id.*)

On May 4, 2018, Dr. Foley saw Plaintiff for a follow-up related to his right shoulder. (R. 407.) It was noted that Plaintiff was not in any acute distress, his right shoulder showed no effusion or edema; positive cross arm and tenderness upon palpitation; showed no deformity; and neurovascularly he was intact. (R. 407.) The impression for Plaintiff was a type one AC separation of the right shoulder. (*Id.*) Conservative management of the condition including physical therapy was used to treat Plaintiff. (*Id.*)

During his May 16, 2018 intake for physical therapy, it was noted that Plaintiff had undergone two surgical repairs in the last year, but that there were no limitations in place. (R. 411.) Plaintiff represented that he was employed as a locator marking underground utilities and asserted significant pain and limitation during work, although he tried to keep his right shoulder moving as able. (R. 412.) Plaintiff showed a reduced range of motion and strength in his upper right extremity. (R. 413.)

During his May 21, 2018 physical therapy session, Plaintiff noted that he had been feeling better, but had overdone it over the weekend when he was unloading the standup tanning bed that he had purchased from his truck, which increased his pain. (R. 425.)

During his May 30, 2018 physical therapy session, Plaintiff noted improvement, but that he experienced significant pain especially in the evenings and mornings. (R. 427.) A subsequent massage caused an exacerbation of his right shoulder pain. (R. 429.) Over the next several therapy sessions, Plaintiff reported spikes in pain that were not consistent. (R. 433, 435, 441.)

On June 27, 2018, Plaintiff again saw Dr. Foley for an evaluation of right shoulder pain. (R. 575.) Plaintiff was not in acute distress. (*Id.*) Plaintiff's strength in his shoulder was either 5/5 or 4+, the shoulder was stable on examination, Popeye's sign[2] was present, and the Neer/Hawkins sign[3] tests for impingement were positive. (R. 576.) Imagining showed mild degenerative changes and no full thickness or high-grade rotator cuff tears. (*Id.*) Dr. Foley opined that the examination showed signs consistent with impingement syndrome. (*Id.*)

On August 29, 2018, State Agency Doctor Shayne Small, M.D., opined that Plaintiff could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, and could sit and walk 6 hours out of an 8-hour workday. (R. 66.) Plaintiff also had an unlimited ability to push and/or pull. (*Id.*) In addition, Dr. Small rated Plaintiff's postural limitation as follows: Plaintiff could frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and Plaintiff could occasionally climb

---

[2]    Popeye's sign is a "a hallmark of biceps tendon rupture." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3716025/ (last visited Jan. 26, 2022).

[3]    Hawkins impingement sign is pain produced by internal rotation of the humerus in 90-degree abduction and Neer impingement sign is pain produced by forceful maximum forward elevation of the upper extremity. *See* Stedman's Medical Dictionary 1769-70 (28th Ed. 2006).

ladders/ropes/scaffold. (R. 66.) Dr. Small also found that Plaintiff was limited with respect to right overhead reaching, and was unlimited with respect to gross manipulation, fine manipulation, and feeling. (*Id.*) In addition, Plaintiff had no visual, communicative, or environmental limitations. (R. 67.) Dr. Small ultimately found that Plaintiff could engage in medium work with shoulder restrictions. (*Id.*) On November 14, 2018, as part of Plaintiff's request for reconsideration, State Agency Doctor Charles Grant, M.D., assessed Plaintiff with the same restrictions as Dr. Small, except for also adding that "[o]verhead lifting restricted to 20 pounds." (R. 79-80.)

On or about September 17, 2018, Plaintiff saw Jason Hurd, M.D., for a second opinion relating to his right shoulder pain. (R. 674.) Plaintiff reported that he slipped and fell on the ice, and that afterwards he had significant pain and discomfort again, localized the over the superior aspect of his shoulder, which did not radiate. (R. 675.) The pain was worse with activity and better with rest. (*Id.*) Plaintiff also noted some cramping in his biceps muscle. (*Id.*) Plaintiff's physical examination showed that he was oriented, in no apparent distress, he walked with a normal gait, the exam of his right shoulder showed his incisions to be well healed, he had full active and passive range of motion, he was tender over his AC joint, he had a positive cross arm adduction test, he was also tender over the anterior aspect of the glenohumeral joint, showed a positive Popeye's sign, and was tender over the biceps muscle belly as well. (R. 675.) He had 5/5 rotator cuff strength, and full range of motion of his elbow, wrist, and hand. (*Id.*) A recent MRI of the right shoulder showed an increased signal around the AC joint, the rotator cuff was intact, biceps were no longer visible, and no other acute pathology was

observed. (*Id.*) He had been treated with conservative measures and expectant care but did not see improvement and continued to rate his pain at 6-7/10. (*Id.*) Dr. Hurd opined that Plaintiff had injured his AC joint and that he may have ruptured his biceps tenodesis. (*Id.*) Plaintiff was treated with an ultrasound guided injection in the AC joint with 2 ml of dexamethasone along with 2 ml of 0.2% ropivacaine. (R. 676.)

On November 16, 2018, Plaintiff presented with right shoulder pain. (R. 677.) Plaintiff rated pain at 5-6/10, described it as achy and sharp, and asserted that the injection he was given during the last office visit only helped for a few days. (R. 677-78.) Plaintiff's exam showed: that he was alert, oriented, and in no apparent distress; he walked with a normal gait; exam of his right shoulder showed his incisions to be well healed; he had full active and passive range of motion; he remained tender over his AC joint; he had a positive cross arm adduction test; he was tender over the anterior aspect of the glenohumeral joint; he had a positive Popeye's sign; he had 5/5 rotator cuff strength; and showed full range of motion of his elbow, wrist, and hand. (R. 678.) A review of the MRI showed increased signal around the AC joint and that there had been an incomplete resection of the distal clavicle with prominence along the posterosuperior aspect of the distal clavicle. (*Id.*) Dr. Hurd discussed treatment options with Plaintiff, and Plaintiff chose to proceed with surgery. (*Id.*) Plaintiff was going to be scheduled for a right shoulder revision, subacromial decompression, and AC joint resection as well as other indicated procedures. (*Id.*)

On July 29, 2019, Plaintiff was seen for a physical examination. (R. 686.) The examination showed that Plaintiff had normal extremity movement. (*Id.*)

Plaintiff is right hand dominant.  (R. 40.)

## III.  <u>LEGAL STANDARD</u>

Judicial review of an ALJ's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018), or whether the ALJ's decision results from an error in law.  *Nash v. Comm'r, Soc. Sec. Admin.* 907 F.3d 1086, 1089 (8th Cir. 2018).  As recently defined by the Supreme Court:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations.  And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence . . . is more than a mere scintilla.  It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

"[T]his court considers evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Nash*, 907 F.3d at 1089 (marks and citation omitted).  "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome."  *Id.*  "In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the [ALJ], the Court must affirm the decision."  *Jacob R. v. Saul*, No. 19-CV-2298 (HB), 2020 WL 5642489, at *3 (D. Minn. Sept. 22, 2020) (citing *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)).

## IV.    <u>DISCUSSION</u>

Plaintiff sets forth two categories of arguments in support of the Motion: (1) the ALJ erred by finding that the treating surgeon's opinion was unpersuasive, and that the state agency reviewer's opinions were persuasive; and (2) that the appointment of Andrew Saul as a single commissioner of SSA who is removable only for cause and served a longer term than that of the President violates Separation of Powers and that accordingly, the decision in this case, by an ALJ who derived their authority from Andrew Saul, is constitutionally defective.  (*See* Dkt. 21.)

The Court addresses each argument in turn.

### A.    **The Weight Assigned to the Medical Opinions**

"A disability claimant has the burden to establish her RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'" *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)).  However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)).  Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his

limitations." *Id.* (quoting *Myers*, 721 F.3d at 527).

Ultimately, it is the ALJ's function to resolve conflicts among medical opinions. *See Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 667 (8th Cir. 2003) (citing *Bentley v. Shalala*, 52 F.3d 784, 785 (8th Cir. 1995); *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000)) (citation omitted). Indeed, "[i]t is the function of the ALJ to weigh conflicting evidence. We will not reverse merely because evidence also points to an alternate outcome." *Dols v. Saul*, 931 F.3d 741, 749 (8th Cir. 2019) (quotation marks and citations omitted). Moreover, an ALJ does not automatically err when relying on the opinions of "consultative examiners, non-examining testifying experts, and non-examining [s]tate [a]gency consultants," when the opinions are supported by the record as a whole. *Belinda B. v. Saul*, No. 20-cv-488 (JRT/LIB), 2021 WL 537932, at *12 (Jan. 28, 2021) (collecting cases). "Courts have routinely upheld ALJ decisions that give significant weight to the opinions of consultative examiners, testifying experts, and state agency consultants when the ALJ's decision to do so is supported by substantial evidence in the record." *Id.* at *13 (collecting cases).

The Court first considers the ALJ's treatment of Dr. Foley's opinions, which the ALJ considered when assessing the RFC. Because Plaintiff's claim was filed after March 27, 2017, the applicable regulation is 20 C.F.R. § 404.1520c. *See Pa M. v. Kijakazi*, No. CV 20-741 (BRT), 2021 WL 3726477, at *6 n.7 (D. Minn. Aug. 23, 2021) ("Since Plaintiff's claim was filed after March 27, 2017, § 404.1527 does not apply because § 404.1520c supersedes any previous statutory requirements.") (citing 20 C.F.R. § 404.1520c). Pursuant to § 404.1520c:

> [An ALJ] will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources. When a medical source provides one or more medical opinions or prior administrative medical findings, [the ALJ] will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. The most important factors [an ALJ] consider[s] when [the ALJ] evaluate[s] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section).

20 C.F.R. § 404.1520c(a). Those factors include "the supportability and consistency of medical opinions and may consider the relationship with the claimant, specialization, and other factors." *Pa M.*, 2021 WL 3726477, at *6 (citations omitted). According the SSA's regulations:

> The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

20 C.F.R. § 404.1520c(b)(2). As such, an "ALJ must explain how those two factors were considered in determining the persuasiveness of a medical opinion." *Jane D. v. Kijakazi*, No. 20-CV-1278-MJD-KMM, 2021 WL 5360450, at *5 (D. Minn. Oct. 26, 2021), *R.&R. adopted by* 2021 WL 5358569 (D. Minn. Nov. 17, 2021) (citation omitted). The SSA has described supportability and consistency as follows:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or

her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. § 404.1520c(c)(1)-(2).

An "ALJ is not required to explain the remaining factors unless the ALJ 'find[s] that two or more medical opinions . . . about the same issue are both equally well supported . . . and consistent with the record . . . but are not exactly the same.'" *Jane D.*, 2021 WL 5360450, at *5 (quoting 20 C.F.R. § 404.1520c(b)(2)-(3)).  The new articulation requirements are meant to "provide individuals with a better understanding of [the Commissioner's] determinations and decisions" and "provide sufficient rationale for a reviewing adjudicator or court."  Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, at 5854, 5858 (Jan. 18, 2017).

Plaintiff argues that with respect to Dr. Foley, the treating orthopedic surgeon, the ALJ purports to apply the supportability and consistency factors but points to no evidence and uses essentially boilerplate language.  (Dkt. 21 at 5.)  First, regarding consistency, Plaintiff asserts that while the ALJ refers to three statements in Dr. Foley's opinion that she considers "inconsistent" (R. 19-20), two of these involve what the ALJ determines to be internally inconsistent statements; namely that Dr. Foley assessed Plaintiff as being capable of low stress but not capable of low stress and able to perform sedentary work but incapable of engaging in competitive employment.  (Dkt. 21 at 5-6 (citing R. 19-20).)

According to Plaintiff, had the ALJ read the entire assessment she would have discovered this is how Dr. Foley completed the form—by checking all of the boxes up to Plaintiff's maximum capacity. (Dkt. 21 at 5-6.) Plaintiff also argues that it is irrelevant even if it is internally inconsistent since if Plaintiff was limited to sedentary work, he would have been considered disabled under the Medical/Vocational Guidelines with respect to the unskilled work proffered by the VE. (*Id.* at 6.) Plaintiff also argues that although the ALJ notes as an "inconsistency" Dr. Foley's assessment that Plaintiff can frequently do firm and fine grasping with the left hand, even though Plaintiff's limitations are in the right arm and hand (Tr. 19-20, 671) under the form, the term "frequently" is the most someone can do in each activity, so checking the "frequently" block means no limitation. (*Id.*) Plaintiff also emphasizes that the ALJ points to no medical evidence in the record that is inconsistent with Dr. Foley's opinion. (*Id.* (citing R. 19-20).)

As to supportability, Plaintiff argues that the ALJ's boilerplate statement that Dr. Foley's opinion "lacks overall consistency with the record" does not meet her duty under § 404.1520c(b)(2) to explain her rationale. (*Id.* at 6-7.)

Defendant's counter to this argument is as follows:

The ALJ properly considered the May 2018 medical source statement form from Plaintiff's treating doctor, Ryan Foley, M.D., along with the other record evidence and explained why she found Dr. Foley's opinion was not persuasive (Tr. 19-20, 667-672). The ALJ noted specific and unexplained internal inconsistencies in Dr. Foley's findings and also found Dr. Foley's overall assessment inconsistent with the other record evidence (Tr. 19-20, 668-672). She further noted the lack of support for the limitations Dr. Foley assessed in Plaintiff's use of his unimpaired left arm (Tr. 20, 671). In addition, although the form provided a place for Dr. Foley to list specific clinical findings and objective signs supporting his assessment, Dr. Foley wrote only "pain" (Tr. 667).

(Dkt. 26 at 23-24.)

     With respect to the opinion of Dr. Foley, the ALJ found:

> Dr. Ryan Foley completed a medical source statement on behalf of the
> claimant and opined the claimant has pain, weakness, and decreased range
> of motion; pain that affects attention concentration often to frequently; and
> that the claimant is incapable of even low stress jobs (Exhibit 5F). However,
> Dr. Foley also opined that the claimant has [sic] is capable of low stress jobs,
> which is contradictory. Nonetheless, Dr. Foley further opined that the
> claimant is capable of sedentary work, but noted the claimant is unable to
> maintain persistence and pace to engage in competitive employment. It was
> also noted that the claimant is expected to miss work four or more days per
> month and that the claimant should refrain for [sic] using his right arm for
> work; however, he could occasionally lift up to 10 pounds, but should never
> reach, pull, or push with [the] right arm. Moreover, he could occasionally
> firm and fine grip with the right had and frequently with the left hand. Dr.
> Foley noted the claimant has good use of the hands and fingers for repetitive
> hand-finger actions. The undersigned does not find this opinion persuasive.
> It is internally inconsistent and lacks overall consistency with the record. Dr.
> Foley imposes restrictions to the left arm; however, the record is void of any
> issues with the left arm.

(R. 19-20.)

     Dr. Foley supported his opinion by relying on Plaintiff's pain, decreased range of

motion, and weakness.  (R. 667.)  There is no dispute that a claimant's own description of

his limitations, such as pain, is part of the RFC analysis.  *See Hensley*, 829 F.3d at 932

(citation omitted).  However, outside of mentioning the pain, weakness, and decreased

range of motion, the ALJ makes no mention or other findings as to whether this

explanation adequately supports the level of restrictions proposed by Dr. Foley.

Moreover, while the ALJ focuses on internal inconsistencies, the ALJ is silent as to how

Dr. Foley's opinion is inconsistent with the evidence from other medical sources and

nonmedical sources in the record.  Boilerplate language stating that portions of the

opinion "lacks overall consistency with the record" without any reference to the record is

insufficient and in violation of regulations. *See Hardy v. Comm'r of Soc. Sec.*, No. 20-

10918, --- F. Supp. 3d ----, 2021 WL 3702170, at *5-6 (E.D. Mich. Aug. 13, 2021);[4]

---

[4]    The court in *Hardy* found as follows:

Both the Commissioner and the magistrate judge described other evidence in the administrative record that could furnish substantial evidence for a nondisability finding and support for rejecting the physicians' opinions. The Commissioner spent several pages of his summary judgment brief documenting record evidence that the ALJ could have cited had she chosen to do so, and he outlines a theoretical path that the ALJ could have followed had she properly applied the regulations requiring that she "explain how [she] considered the supportability and consistency factors for a medical source's opinions." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). They both refer to *Biestek v. Commissioner of Social Security*, which allows courts to "consider this evidence, even if the ALJ failed to mention it." 880 F.3d 778, 786 (6th Cir. 2017), *aff'd sub nom. Biestek v. Berryhill*, ––– U.S. ––––, 139 S. Ct. 1148, 203 L.Ed.2d 504 (2019) (citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) ("Judicial review of the Secretary's findings must be based on the record as a whole. Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited [in prior SSA proceedings].")).

That reasoning, however, ignores the mandate of the regulations that guarantees claimants a certain level of process that cannot be discounted by the substantial evidence test alone. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 410 (6th Cir. 2009). Even if the Court "were to agree that substantial evidence supports the ALJ's weighing of each of these doctors' opinions, substantial evidence alone does not excuse non-compliance with [the regulations] as harmless error." *Ibid.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546 (6th Cir. 2004)). The court of appeals has explained that "recogniz[ing] substantial evidence as a defense to non-compliance with [the regulations] would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory. The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to 'set aside agency action . . . found to be . . . without observance of procedure required by law.'" *Wilson*, 378 F.3d at 546 (quoting Administrative Procedure Act, 5 U.S.C. § 706(2)(D) (2001)).

*Corpuz v. Saul*, No. 2:19-CV-02401 AC, 2021 WL 795582, at *8 (E.D. Cal. Mar. 2, 2021) (quoting *Garrison v. Colvin*, 759 F.3d 995, 1012-13 (9th Cir. 2014)) ("The ALJ failed to meaningfully address the two key factors identified in the 2017 regulations: consistency and supportability. 20 C.F.R. § 404.1520c(b)(2) . . . The unsupported and conclusory statement that the sit/stand/walk limitations are 'not supported by the other objective evidence of record' is not sufficient. Without weighing Dr. McMillan's opinion more heavily than the other medical opinions, it remains the case that 'an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion.'").

Here, the ALJ does not address the supportability of Dr. Foley's limitations of Plaintiff to lifting or carrying only up to 10 pounds or less, that he should avoid using his right arm, and could never reach, pull, or push with his right arm. (R. 670-71.) While it is not entirely clear, the ALJ appears to assert that Dr. Foley's opinion that Plaintiff could not use his arm is inconsistent with Dr. Foley's opinion that Plaintiff could occasionally lift up to ten pounds. However, this ignores the fact that the limitation at issue focuses on the use of Plaintiff's right arm and not his left, and it is unclear based on the opinion if the reference to lifting relates to the left hand, such as for a gallon of milk or paint. It also important to note that the ALJ assessed that Plaintiff could perform medium work, with some decreased limitation for pushing and pulling and overhead lifting. (R. 17.)

---

2021 WL 3702170, at *5-6.

Under the regulations, "medium" and "sedentary" work are defined as follows:

> (a) Sedentary work. Sedentary **work involves lifting no more than 10 pounds at a time** and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> \* \* \*

> (c) Medium work. **Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pound**s. If someone can do medium work, we determine that he or she can also do sedentary and light work.

20 C.F.R. § 404.1567 (emphasis added). Given the stark contrast between the lifting limitations, the ALJ must set forth more to address whether Dr. Foley's limitation is supported by the record as a whole.

Moreover, the ALJ attempts to dismiss the limitations with respect to the use of the right arm because plaintiff had some ability to use his hands. However, the ALJ is playing doctor in assuming that use of the hands automatically means one can use their arms with respect to repetitive pulling and pushing. *See Pate-Fires v. Astrue*, 564 F.3d 935, 946-47 (8th Cir. 2009) ("ALJ 'playing doctor," a practice forbidden by law.") (citation omitted). Most concerning is the ALJ's failure to point to anything in the medical record or non-medical record to support her finding with respect to the consistency of Dr. Foley's opinion.

In sum, the Court finds that the ALJ has failed to meet the requirement under 20 C.F.R. § 404.1520c in terms of addressing the supportability of the opinion and the consistency of the opinion as it relates to the lifting restriction and with restrictions

22

dealing with the use of Plaintiff's arms, including with respect to  Dr. Foley's opinions as

to Plaintiff's ability to push, pull, and reach with his right arm.  While an ALJ need not

reference every piece of evidence in the record, providing an explanation supported by

substantial evidence with reliance on the record is consistent with the purposes of

§ 404.1520c of allowing Plaintiff and this Court to understand the basis for the ALJ's

decision.  *See* 82 FR 5844-01, at 5854, 5858 (Jan. 18, 2017).

For all these reasons, the ALJ's decision should be remanded for the

Commissioner to comply with § 404.1520c.  *See Carter v. Sullivan*, 909 F.2d 1201, 1202

(8th Cir. 1990) (per curium) (finding that the SSA's "failure to follow its own binding

regulations is a reversible abuse of discretion.") (citations omitted).

**B.     Whether the ALJ's Decision, Who Derived their Authority from
         Andrew Saul, is Constitutionally Defective.**

Plaintiff originally sought remand on the grounds that the appointment of former

Commissioner Andrew Saul violated the separation of powers doctrine and accordingly,

the ALJ's decision is constitutionally defective because the ALJ derived his authority

from former Commissioner Saul.  (Dkt. 21 at 9-12.)  Defendant opposes this argument on

a number of grounds (Dkt. 26 at 7-21), and in his reply brief, Plaintiff asks the Court not

to reach the constitutional issues if it otherwise determines that remand is required.[5]

---

[5]     Although Plaintiff suggests that remand for a hearing before a "new ALJ" would
cure certain of Plaintiff's alleged constitutional issues (Dkt. 29 at 7), Plaintiff did not seek
remand for a hearing before a new ALJ if the Court remanded on non-constitutional
grounds, and in fact asked the Court to decline to reach the constitutional issues if it
remanded on other grounds (*id.* at 2).  Accordingly, the Court's recommendation for
remand does not include a recommendation that the Court require a hearing before a
"new ALJ."

(Dkt. 29 at 2 (citing *Ashwander v. Tennessee Valley Authority*, 297 U.S. 299, 347 (1936) (Brandeis, J., concurring)).

"It is the established practice of the federal courts to avoid the decision of delicate constitutional questions if the case presenting them may be disposed of on alternative grounds." *Beeson v. Hudson*, 630 F.2d 622, 627 (8th Cir. 1980) (collecting cases); *see also O'Brien v. U.S. Dept. of Health and Human Servs.*, 766 F.3d 862 (8th Cir. 2014) (explaining that "the doctrine of constitutional avoidance particularly counsels [the court] not to give unnecessary answers to constitutional questions."); *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) ("It is a foundational principle in our legal system, enunciated by Justice Brandeis in a familiar concurrence, that courts must make every effort to avoid deciding novel constitutional questions."); *Cochenour v. Cochenour*, 888 F.2d 1244, 1245-46 (8th Cir. 1989) ("finding "[w]e need not reach constitutional issues unless required to do so to decide the case.") (citations omitted). Accordingly, applying the principles stated above, because the Court recommends remand on other substantive grounds, the Court does not reach the constitutional arguments raised by Plaintiff. *See Ernestine L. v. Kijakazi*, No. 1:21CV139, 2022 WL 110240, at *5 (N.D. Ind. Jan. 12, 2022) (citing *Ashwander*, 297 U.S. at 347) ("As this Court has determined that remand is required on the above substantive issues, the Court will invoke the doctrine of constitutional avoidance and not reach the constitutional issue.").

## V.    <u>RECOMMENDATION</u>

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.    Plaintiff Dwile K. II's Motion for Summary Judgment (Dkt. 20) be **GRANTED** in part;

2.    Defendant Acting Commissioner of Social Security Kilolo Kijakazi's Motion for Summary Judgment (Dkt. 25) be **DENIED**;

3.    This case be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Report and Recommendation; and

4.    That the case be **DISMISSED WITH PREJUDICE**.

DATED: January 27, 2022            *s/Elizabeth Cowan Wright*
                                   ELIZABETH COWAN WRIGHT
                                   United States Magistrate Judge

### <u>NOTICE</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).